**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

GWENDOLYN LAWSON,

                                CIVIL ACTION NO. 16-cv-14059

         *Plaintiff*,            DISTRICT JUDGE LINDA V. PARKER

*v.*                             MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant.*

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 17, 20)

### I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Lawson is not disabled. Accordingly, **IT IS RECOMMENDED** that Lawson's Motion for Summary Judgment, (Doc. 17), be **DENIED**, that the Commissioner's Motion, (Doc. 20), be **GRANTED**, and that this case be **AFFIRMED**.

### II.    REPORT

#### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff Gwendolyn Lawson's ("Lawson") claim for Disabled Widow's Benefits ("DWB") and Disability Insurance Benefits under Title II, 42 U.S.C. § 401 *et seq.*, and

1

Supplemental Security Income Benefits ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq.* (Doc. 4). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 17, 20).

On August 20, 2013, Lawson filed concurrent applications for DWB, DIB, and SSI, alleging a disability onset date of January 1, 2011. (Tr. 214-20). The Commissioner denied her claims. (Tr. 72-114). Lawson then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on August 11, 2015 before ALJ Ramona Fernandez. (Tr. 33-71). The ALJ's written decision, issued August 27, 2015, found Lawson not disabled. (Tr. 8-32). On October 6, 2016, the Appeals Council denied review, (Tr. 1-5), and Lawson filed for judicial review of that final decision on November 16, 2016. (Doc. 1).

**B.     Standard of Review**

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.  Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . .

physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two. 20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ found Lawson not disabled under the Act. (Tr. 32). At Step One, the ALJ found that Lawson last met the insured status requirements through September 30, 2015, and had not engaged in substantial gainful activity since January 1, 2011, her alleged onset date. (Tr. 13-14). At Step Two, the ALJ concluded that the following impairments qualified as severe: osteoarthritis, cervical spondylosis, cervical radiculopathy, lateral epicondylitis, and osteoarthritis of the left knee. (Tr. 14-15). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 15). Thereafter, the ALJ found that Lawson had the residual functional capacity ("RFC") to perform light work, except:

> [S]he can occasionally climb, stoop, kneel, crouch, crawl, or balance. She should never climb ladders, ropes, or scaffolds. She is limited to frequent over shoulder reaching with the left upper extremity and occasional over shoulder reaching with the right (dominant) upper extremity.

(Tr. 15). At Step Four, the ALJ found Lawson incapable of performing her past relevant work. (Tr. 25). But proceeding to Step Five, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Lawson can perform. (Tr. 25-26).

###    E.    Administrative Record

####        1.    Medical Evidence

The Court has reviewed Lawson's medical record. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

####        2.    Application Reports and Administrative Hearing

#####            i.    Function Report

Lawson filled out a Function Report on September 3, 2013, which appears in the administrative record. Describing her conditions, she said "[m]y neck and sho[u]lders really hurt and when I do things the pain worsens and moves down my arms and into my hands." (Tr. 295). Each day, she woke and ate breakfast, took a shower, then sat at home and watched television and visited with her children. (Tr. 296). "I wake up at times in pain. Sometimes it's hard to go back to sleep." (*Id.*). She encountered no specific difficulties with personal care activities such as dressing, bathing, or shaving, though her "children do my cleaning for me." (*Id.*). She prepared meals mostly in the form of "frozen dinners and sandwiches with soup" twice daily, but no longer cooked "complete meals." (Tr. 297). Around the house, she could make the bed but "my children do the

rest." (*Id.*). "I do not do house and yard work due to my neck[,] sho[u]lder and arm pain." (Tr. 298).

Every day, Lawson ventured outside. She could drive a car and go out alone to shop for groceries and "personal needs," which she did once a month for "about an hour." (*Id.*). Although she retained the capacity to pay bills and count change, she avoided handling savings accounts or using checkbooks/money orders because she did "not really know[] how to spell or subtract." (*Id.*). Her hobby remained "[s]pending time with my children and grandchildren," which "I do . . . often and I do it well." (Tr. 299). "I see them a lot more often now. Just don't get to lift them anymore." (*Id.*). She would "go out to dinner," or talk and visit with people every day. (*Id.*). She attended church services "every Sunday." (*Id.*). But "[b]ecause I don't really do much. I see less of my family [and] friends. I also don't—can't do fieldtrips with my grandkids." (Tr. 300).

Prompted to mark abilities with which she struggled, she marked: lifting, standing, reaching, walking, sitting, completing tasks, and using hands. (*Id.*). "I have to change my positions a lot. I can't lift over" ten pounds. (*Id.*). She could walk about seven to ten minutes before needing a rest. (*Id.*). Despite being a poor reader and having trouble following written directions, she followed spoken instructions "[p]retty well" and could pay attention "all the time." (*Id.*). She did her best to handle changes in routine or stress. (Tr. 301).

### ii.      Lawson's Testimony at the Administrative Hearing

After reviewing some basic information as to Lawson's height, weight, and age, she noted that she could drive, and that the highest grade she completed in school was the

tenth. (Tr. 41-42). The last time she worked was four years prior to the hearing, and her last job involved "run[ning] stuff through machines to make like pool filters and stuff like that." (Tr. 43). Due to a "[l]ack of work," she was let go, and she received unemployment "[f]or a short time" thereafter. (*Id.*). In the job prior to that, she "tested like air bags, radios. We would do stuff for the wiper blades on cars," and the work demanded an ability to lift "maybe 50 pounds" on a regular basis. (Tr. 45). She supplemented her income with a cleaning job for several years in that time as well. (Tr. 46-47). During her period of unemployment, Lawson continued to look for work, and "[t]ried to like stay into the factory type, you know, because that's what I was more comfortable with." (Tr. 43). She was not, however, still looking for work. (*Id.*).

Lawson's mother passed away in August 2013, and Lawson cared for her until her death. "She had dementia so we—you know, I had to cook for her. She wasn't allowed to be left alone, so we had to be there; sometimes help her to the bathroom." (Tr. 44). For this work, "I was getting paid for probably about six months, then my sister took over. And then I had her for probably a month, maybe two, and then she passed." (Tr. 50).

Asked why she was unable to work, Lawson noted "[t]he pain in my neck and shoulders, and not being able to really sit or stand too long." (*Id.*). These problems plagued her for "[a]t least three years." (*Id.*). During that time, she participated in physical therapy and took Motrin and Tylenol. (Tr. 51). "[W]hen I'm standing, after I stand for just a little bit my feet and legs start like feeling tingly, numb. It causes my like back to start hurting" after fifteen to twenty minutes. (Tr. 52). Her physical therapy was

focused mainly "on my neck and shoulders, because that's what hurts me the worst is my neck and shoulders." (Tr. 53).

To pass the time, Lawson would watch movies with her grandchildren. (Tr. 54). "Sometimes I'll sit outside and they'll be riding their bikes and, you know, watch them play. Me and my sisters go to dinner, go to the movie." (*Id.*). Per her doctor's recommendations, Lawson also tried to exercise—*i.e.*, "jumping jacks and walking"—but those activities often exacerbated her pain. (Tr. 54-55). She predicted that, if placed in a job, her pain would cause her to miss work frequently. (Tr. 55-56). The pain in her neck and arms on a regular day ranged "about an eight, seven/eight." (Tr. 56). She could only sit for fifteen to twenty minutes before the lower part of her back and her hips started hurting. (Tr. 57). She could walk approximately a block at one time, and could "[m]aybe" lift "a gallon of milk, and it still hurts." (Tr. 57). She also attended a grievance support group from time to time. (Tr. 59).

### iii. The VE's Testimony at the Administrative Hearing

The ALJ next called upon the services of the VE in attendance. His first task was to classify Lawson's past work: unskilled medium work performed at the medium range. (Tr. 62). The ALJ then presented her first hypothetical: "assume an individual who can perform medium work; but only frequently stoop, kneel, crouch, crawl or balance; only occasionally use ladders, ropes or scaffolds; and only occasionally climb. Could that individual perform any of the past work?" (Tr. 63). The VE indicated that such a person could perform both of Lawson's past jobs. The ALJ then tweaked the hypothetical, limiting the individual "to light work with only occasional climbing, stooping, kneeling,

crouching, crawling or balancing; and no use of ladders, ropes or scaffolds, . . ." (Tr. 63). The VE noted that such a person could not perform Lawson's past work. Other work in the national economy, however, would exist, including: production assembler—with 2,000 regional job availabilities and 218,000 national job availabilities—"some sorting and inspecting jobs"—with 2,500 regional job availabilities and 350,000 national job availabilities—as well as "packaging and packer"—with 2,500 regional job availabilities and 350,000 national job availabilities. (Tr. 64).

In the ALJ's third hypothetical, the individual "required the opportunity to sit or stand at will," which the VE said would alter the number of available jobs by "about 50 percent" in each category. (Tr. 64). Different jobs without reduced numbers would also exist, such as "counter clerk type jobs," numbering 1,000 regional job availabilities and 150,000 national job availabilities. (Tr. 64). The ALJ presented a fourth hypothetical with the same limitations except the individual was limited to sedentary work, and the VE indicated that such an RFC was work preclusive as to Lawson's past work, but not a variety of other jobs, including: "some simple sorting and inspecting jobs"—with 1,000 regional job availabilities and 100,000 national job availabilities—"some simple assembly jobs"—with 1,200 regional job availabilities and 75,000 national job availabilities—and "packing and bagging and stuffing type jobs"—with 1,000 regional job availabilities and 150,000 national job availabilities. (Tr. 65).

The ALJ's fifth hypothetical limited the individual further to "frequent handling and fingering with the right dominant hand," which the VE indicated would have no impact on the job numbers just given. (Tr. 66). The hypothetical that followed limited the

individual to "occasional handling and fingering with the right dominant hand," which the VE said was work preclusive except as to the job of surveillance system monitor, with 500 regional job availabilities and 5,000 national job availabilities. (*Id.*).

In her seventh hypothetical, the ALJ asked about any reductions in job numbers given throughout the last hypotheticals if the limitation of frequent reaching above the left shoulder and occasional reaching above the right shoulder were considered. (Tr. 66-67). The VE found the question difficult to answer, but in his experience found that "reaching in all directions is what is generally required," "especially at the medium range." (Tr. 67). He cautioned, however, that he could not give a definitive answer as to Lawson's past work on this question. (*Id.*). After Lawson indicated that she reached over her head on a "less than occasional" basis in her past work, the VE indicated that such a limitation would not have interfered with performance of her past work "[a]s actually performed." (Tr. 68). He also reasoned that "none of the jobs" he cited "at light or sedentary would be affected by those factors[.]" (Tr. 69).

In the eighth and final hypothetical, the ALJ asked whether a limitation causing "absences three or more times per month" would affect the numbers given in previous responses. (Tr. 69). The VE noted that such a limitation was work preclusive. (*Id.*).

## F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or

certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting

objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*,

749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20

C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.     Analysis

Lawson furnishes two arguments in her memorandum: (1) the ALJ's credibility findings rest on cherry-picked evidence, and; (2) the ALJ's findings as to Lawson's education lack evidentiary support and deny her the benefit of Grid Rules for her age group that would dictate a finding of disability. I address each argument in turn.

#### 1.     Credibility Analysis

Lawson first contends that the ALJ "went out of her way to find 'inconsistences and other credibility factors' to determine no disability." (Doc. 17 at ID 696) (citing Tr. 43-62). "[A]n ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' However, they must also be supported by substantial evidence." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (internal citation omitted). In particular, Lawson highlights three lines of argument that appear in the ALJ's opinion as erroneous: (a) that Lawson's lay-off—coupled with little evidence of deterioration in her condition since—implied that she "would be able to perform" her past work; (b) that Lawson's application for and receipt of unemployment benefits bore negatively on her credibility; and (c) that the ALJ mischaracterized Lawson as having an "active lifestyle,"

against the weight of the evidence. (Doc. 17 at ID 696-97). These arguments essentially accuse the ALJ of cherry-picking unfavorable evidence, and they buckle under scrutiny.

As to the first line of reasoning, the Sixth Circuit has plainly indicated that "[a]pplications for unemployment and disability benefits are inherently inconsistent," as there is "'no reasonable explanation for how a person can claim disability benefits under the guise of being able to work, and yet file an application for unemployment benefits claiming that [she] is ready and willing to work.'" *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 901 (6th Cir. 2004) (quoting *Bowden v. Comm'r of Soc. Sec.*, 173 F.3d 854, 1999 WL 98378, at *8 (6th Cir. Jan. 29, 1999) (unpublished table decision)). Factoring this inconsistency into a credibility analysis remains entirely appropriate. *Accord e.g.*, *Logan v. Comm'r of Soc. Sec.*, No. 13-CV-12807, 2014 WL 2217235, at *3 (E.D. Mich. May 29, 2014) ("The Court discerns no error in the ALJ's decision to discount Plaintiff's credibility based on the fact that she collected unemployment benefits during the time period in which she claimed to be entitled to disability insurance benefits; the ALJ's conclusion is permissible under *Workman*."). The same is true for the second line of reasoning; one who ceases work for reasons unrelated to disability tends to have more difficulty proving that disability now prevents her from resuming work. *E.g.*, *Dinicola v. Comm'r of Soc. Sec.*, No. 14-CV-13937, 2015 WL 5675075, at *4-5 (E.D. Mich. Aug. 31, 2015), *report and recommendation adopted,* No. 14-CV-13937, 2015 WL 5679745 (E.D. Mich. Sept. 25, 2015) (upholding an ALJ's decision to consider this fact in his credibility analysis); *Reilly v. Comm'r of Soc. Sec.*, No. 1:13-CV-1096, 2015 WL 1459509, at *7 (W.D. Mich. Mar. 30, 2015) (same).

The Commissioner concedes that the ALJ mistakenly identified sledding as part of Lawson's "active lifestyle . . . ." (Tr. 24). This error does not, however, neutralize the numerous other reasons given in support of the ALJ's adverse credibility finding, such as: a discrepancy in Lawson's "statements regarding past employment earnings"; her lack of difficulty accomplishing activities of daily living; her ability to drive alone, shop in stores, and handle bills; her regular social activity and church attendance; her capacity to babysit for her grandchildren; and her ability to care for her mother. (Tr. 24); *e.g.*, (Tr. 234-43, 296-97, 299, 340, 351, 363, 396, 435, 455). These considerations amply compensate for any deficit in the ALJ's analysis. *See Brzezinski v. Comm'r of Soc. Sec.*, No. 1:16-CV-522, 2017 WL 1395771, at *7 (W.D. Mich. Apr. 19, 2017) ("[A]gency regulations clearly allow an ALJ to consider a claimant's daily activities in assessing the credibility of the claimant's statements." (citing SSR 96-7p, 1996 WL 374186, at *3 (S.S.A. July 2, 1996))); *Coon v. Comm'r of Soc. Sec.*, No. 1:07CV807, 2008 WL 4411473, at *4 (S.D. Ohio Sept. 29, 2008) (finding that the ALJ's mistake of fact did not undermine his credibility analysis because, "[b]ased on the ALJ's exhaustive recitation of Plaintiff's medical history, it is apparent that the ALJ did not base his decision on the sole fact that Plaintiff failed to attend physical therapy"); *cf. Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007) ("*undu[e] concentrat[ion]* on one single aspect of the claimant's history, if that one aspect does not reasonably portray the reality of the claimant's circumstances," will undermine an ALJ's credibility finding (emphasis added)); *Alam v. Comm'r of Soc. Sec.*, No. 13-CV-14480, 2014 WL 5312525, at *6 (E.D. Mich. Oct. 17, 2014) ("The ALJ's credibility determination is not supported by

substantial evidence where it relies in part on a mistake of fact that was 'material to the overall assessment of [Plaintiff's] credibility.'" (quoting *Drew v. Astrue*, 2010 WL 1946335, at *4 (D. Me. May 12, 2010) (emphasis added))). Put another way, "we see little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009).

For these reasons, substantial evidence bolsters the ALJ's credibility findings, and this Court should not disturb the ALJ's conclusions on the grounds Lawson highlights.

## 2. Education and Age Group

Lawson next contends that the ALJ failed to account for her proper age group—closely approaching advanced age—and overestimated her educational capacity in spite of her inability to "spell or subtract" or "testify clearly . . . ." (Doc. 17 at ID 697-98). Instead, Lawson posits that the ALJ should have found her to be "marginally educated" and "closely approaching advanced age." (Doc. 17 at ID 698); 20 C.F.R. § 404.1564(b)(3) ("Marginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple unskilled types of jobs. We generally consider that formal schooling at a 6th grade level or less is a marginal education."); 20 C.F.R. § 404. 1563(d) ("If you are closely approaching advanced age (age 50-54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work."). Although Lawson does not say so explicitly, she implies that these findings should have dictated a finding of disability according to the relevant Grid Rules. *See, e.g., Harrison v. Comm'r of Soc.*

*Sec.*, No. 1:13-CV-58, 2014 WL 1232685, at *5 (W.D. Mich. Mar. 25, 2014) ("When the requirements of a particular grid rule are met, the rule is conclusive rather than presumptive, and cannot be rebutted by expert vocational testimony."). *See generally* 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.09.

The Commissioner concedes that Lawson passed into the "closely approaching advanced age" category when she turned fifty-years old in December 2013, but defends the ALJ's finding as to Lawson's education. Indeed, Lawson testified that she completed the tenth grade, which typically qualifies as a "limited" education. (Tr. 282); 20 C.F.R. § 404.1564(b)(3) ("We generally consider a 7th grade through the 11th grade level of formal education is a limited education."). I note as well that Lawson appears to have had little difficulty filling out her own Function Report—which featured few spelling errors—and retains the capacity to "[c]ount change" and "[p]ay bills." (Tr. 295-302, 298). Accordingly, the ALJ did not err in crediting Lawson's more measurable testimony as to schooling over her subjective statements as to skills. Resolving conflicts such as this within the record falls squarely within the ALJ's purview. *E.g. Harper v. Comm'r of Soc. Sec.*, No. 2:16-CV-11428, 2017 WL 3124334, at *7 (E.D. Mich. June 26, 2017), *report and recommendation adopted,* No. 16-11428, 2017 WL 3116279 (E.D. Mich. July 21, 2017) ("The ALJ's discussion, alongside its supportive citations, illustrates exactly how he resolved this conflicting evidence in the record—as was his prerogative—and bolsters the strength of his conclusion."). *See generally Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 648 (6th Cir. 2011) ("When deciding . . . whether substantial evidence supports the

ALJ's decision, we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility.").

Even assuming error in this respect would provide Lawson little solace. The Grid Rules mandate a finding of disability for a person closely approaching advanced age only when her past work was unskilled (or nonexistent) and when she is "[i]lliterate or unable to communicate in English." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.09. There seems no question, on these facts, that Lawson is literate and able to communicate in English. To the extent the ALJ erred in the manner Lawson suggests, therefore, such error is harmless and cannot warrant remand.

### H. Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Lawson's Motion for Summary Judgment, (Doc. 17), be **DENIED**, that the Commissioner's Motion, (Doc. 20), be **GRANTED**, and that this case be **AFFIRMED**.

## III. REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that

making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: August 29, 2017      S/ PATRICIA T. MORRIS
              Patricia T. Morris
              United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: August 29, 2017      By s/Kristen Castaneda
             Case Manager